# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRISTOPHER J. BAUER, *et al.*,

      Plaintiffs,

vs.

CITY OF CINCINNATI, *et al.*,

      Defendants.

Case No. 1:09-cv-46

Judge Timothy S. Black

## MEMORANDUM OPINION AND ORDER

This civil case is before the Court on Defendants' Motion for Summary Judgment (Doc. 29) and the parties' responsive memoranda (Doc. 36, Doc. 38). For the reasons stated herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Plaintiffs filed a complaint arising from an encounter between Plaintiff Christopher J. Bauer and Cincinnati Police Officers Andrew Mitchell and Dewayne McMenama on the evening of January 22, 2008. Plaintiffs allege that during this encounter, Defendants violated their constitutional rights and committed tortious acts. More specifically, Plaintiff alleges that while he was innocently walking home from work, listening with earplugs to his MP3 player, two Cincinnati police officers appeared without notice to him, and, within eight seconds, tased him in his back through the driver-side window of the cruiser, dropping him face first to the ground, followed within three seconds with a second tasing while Plaintiff lay prone on the ground, resulting in traumatic brain injury.

## A.  UNDISPUTED FACTS[1]

1.  On January 22, 2008, a holdup alarm was triggered at a Jersey Mike's near Glenway Avenue and Glen Crossing Way.  (Doc. 29 at 25, ¶ 1).

2.  Officers Mitchell and McMenama decided to respond to the holdup alarm because they were about 60 seconds away.  (*Id.* at ¶ 2).

3.  Officers approaching holdup alarms are trained to be cautious and to watch out for suspects.  (*Id.* at ¶ 6).

4.  A holdup alarm is an emergency that officers must respond to as quickly and safely as they can.  (*Id.* at ¶ 7).

5.  As they approached the parking lot in front of the Jersey Mike's, the officers observed that the Jersey Mike's sign did not appear to be lit, the interior lights seemed dim, and there did not appear to be people inside the restaurant.  (*Id.* at ¶ 9).

6.  The fact that no one appeared to be inside the Jersey Mike's raised Officer Mitchell's suspicion that something was wrong.  (*Id.* at ¶ 10).

7.  Plaintiff Christopher J. Bauer was 19 years old at the time of the incident, and an employee of Gamestop, a retail store near Glenway Crossing.  (Doc. 36 at 28, ¶ 1).

8.  On January 22, 2008, Bauer was walking in a westerly direction from the area near a Chinese restaurant when first observed by Officers Mitchell and McMenama.  (*Id.* at ¶ 2).

9.  There were no other pedestrians in the area. (Doc. 29 at 26, ¶ 13).

10.  The winter evening was dark and cold.  (Doc. 36 at 28, ¶ 3).

11.  Bauer had his head hunched over and his hands appeared to be in his pockets or tucked inside his coat. (Doc. 29 at 26, ¶ 15).

---

[1] These facts were taken from Defendants' Motion for Summary Judgment (Doc. 29) and the parties' responsive memoranda (Doc. 36, Doc. 38).  Unless otherwise noted, neither party objected to the opposing party's statement of facts.

12.  Bauer was walking at a normal pace.  (Doc. 36 at 28, ¶ 4).

13.  The officers made a "split-second" decision to stop and talk to Bauer –
     rather than go directly to the Jersey Mike's restaurant –  because of their
     extremely rapid response, the lights at the Jersey Mike's were off or
     dimly lit, Bauer was the only person in the area, and he appeared to be
     coming directly from the Jersey Mike's.  (Doc. 29 at 27, ¶ 19 ).

14.  Officer McMenama asked Officer Mitchell to let him out of the car and
     Officer McMenama stepped out.  (*Id.* at  ¶ 20).

15.  Officers Mitchell and McMenama relied on verbal orders to alert Bauer
     to their presence and ask him to speak with them.[2]  (Doc. 36 at 29, ¶ 10).

16.  Bauer continued walking in the same manner and pace.  (Doc. 29 at 28,
     ¶ 26).

17.  The headlights of the police cruiser were behind Bauer and were
     illuminating him.  (*Id.* at ¶ 27).

18.  Officer Mitchell continued to follow Bauer in the car to maintain a
     mechanical advantage in case Bauer tried to flee.  (*Id.* at ¶ 28).

19.  Officer McMenama began "pieing off" and moving to the right of Bauer.
     (*Id.* at ¶ 31).

20.  Officer McMenama yelled at Bauer, "Sir, I need to talk to you" and ordered
     him to show his hands.[3]

21.  Officer McMenama drew his firearm.  (*Id.* at ¶ 34).

22.  Officers Mitchell and McMenama had available to them the police cruiser's
     emergency flashing lights, siren, air horn, and intercom system to alert
     Bauer to their presence, but did not use them.  (Doc. 36 at 29,  ¶ 11).

---

[2] Defendants admit that the officers relied on verbal orders, but further assert that they sought
to engage Bauer by virtue of yelling at the top of their voices, by utilizing the headlights from
their car, and by believing that Officer McMenama, approaching from behind and to the side,
was in Mr. Bauer's field of peripheral vision.

[3] Plaintiff disputes this version of events, claiming he never was made aware of the officers.

23. After Bauer turned the corner of the building, he bumped into a yellow concrete pylon. (*Id.* at ¶ 42).

24. Officer Mitchell believed that the way Bauer cut the corner, coupled with his ignoring their commands and failing to comply with their orders, was a precursor to flight. (Doc. 29 at 29, ¶ 43).[4]

25. At that point, Officer Mitchell decided to arrest Bauer for obstruction of official business. (*Id.* at ¶ 44).

26. Officer Mitchell extended his taser through the open cruiser window and tased Bauer, causing Bauer to fall to the ground. (Doc. 36 at 29, ¶ 13).

27. The officers did not verify the status of the alarm before the tasing. (*Id.* at 28, ¶ 6).

28. Officer Mitchell did not give warning to Bauer that his taser would be deployed prior to the tasing. (*Id.* at ¶ 7).

29. The first tasing lasted seven seconds. (*Id.* at 29, ¶ 15).

30. After Bauer was tased, the officers approached him. (Doc. 29 at 30, ¶ 48).

31. Officer Mitchell cycled the taser for an additional five seconds. (*Id.* at ¶ 52).

32. The time lapse between when the first tasing ceased and the second tasing began was three seconds. (Doc. 36 at 29, ¶ 16).

33. After picking Bauer up, Officer Mitchell saw an MP3 player on the ground. (*Id.* at ¶ 54).

34. Officer Mitchell does not believe Bauer was listening to the MP3 player because the cable for the earbuds were wrapped around the MP3 player. (*Id.* at ¶ 55).

35. Shortly after placing Bauer in custody, the officers learned that the holdup alarm was false. (*Id.* at ¶ 56).

---

[4] This is a disputed issue of fact. Plaintiffs dispute that Bauer was ever aware of the officers' presence or consciously ignored their orders. (Doc. 36 at 29, ¶ 12).

36.  The officers then called for EMS to respond to the tasing and treat Bauer. (*Id.* at ¶ 57).

37.  Bauer has no memory of the night of the incident.  (*Id.* at ¶ 58).

38.  Charges were preferred against Officer Mitchell on April 2, 2008, which included an allegation that:

> "You did not verify the status of the alarm, whether an offense occurred, nor obtain a suspect description.  As you approached Mr. Bauer, he showed no signs he was aware you were there nor displayed any signs of aggression or resistance.  You did not give a verbal warning prior to deploying your TASER.  Your TASER deployment was not in conformance with Department Standards." (Doc. 36 at 30, ¶ 23).

39.  At a pre-disciplinary hearing by the City of Cincinnati Police Department on April 30, 2008, it was the finding that:

> "Police Officer Andrew Mitchell used more force than was necessary to stop and detain Christopher Bauer, Jr.  Whether or not Mr. Bauer was wearing earphones and listening to an IPOD is not important to this hearing.  Officer Mitchell was not justified in the use of force to stop anyone.  There was no confirmed crime to investigate.  Officer Mitchell's primary responsibility, as first car on scene, was to respond directly to Jersey Mike's Restaurant to investigate and determine the validity of the alarm.  In doing so, he would have discovered the alarm was false and no other action was necessary.  Had the alarm been 'good' as Officer Mitchell feared, he would have been in a position to render aid to victims, obtain and broadcast a description of the suspect, protect the crime scene, and collect evidence." (*Id.* at ¶ 24).

## II.    PROCEDURAL HISTORY

Plaintiffs Christopher J. Bauer and Christopher A. Bauer brought suit on January 21, 2009 against Officers Mitchell and McMenama, Cincinnati Police Chief Thomas Streicher, and the City of Cincinnati. Plaintiffs assert claims under 42 U.S.C. § 1983, alleging that: (1) Officers Mitchell and McMenama detained Christopher J. Bauer in violation of the Fourth Amendment; (2) Officers McMenama and Mitchell used excessive force to detain him in violation of the Fourth Amendment; and (3) the City of Cincinnati faces municipal liability under § 1983 due to its failure to train and supervise the officers. (Doc. 1 at ¶¶ 25-40). Christopher J. Bauer also asserts claims against Officer Mitchell, Officer McMenama, and Chief Streicher under state tort law for: (1) negligence; (2) assault and battery; and (3) false imprisonment and false arrest. (*Id.* at ¶¶ 42, 45, 54). Bauer alleges that the City of Cincinnati is vicariously liable for the torts of its employees. (*Id.* at ¶ 48). Finally, Plaintiffs allege a claim for emotional distress on behalf of Christopher A. Bauer, father of Christopher J. Bauer, alleging that the former was caused to observe the assault of his son and as a result suffered a loss of society and companionship. (*Id.* at ¶ 50).

Plaintiffs seek damages resulting from the tasings for Christopher J. Bauer's personal injuries, medical bills, lost income, loss of enjoyment, severe emotional distress, indignities, and humiliation, as well as Christopher A. Bauer's related medical bills. (*Id.* at ¶¶ 46, 52). Plaintiffs further seek punitive damages, attorneys' fees, and costs. (*Id.* at ¶ 56). Defendants timely filed an answer denying liability. (Doc. 3).

On June 30, 2011, Defendants filed a motion for summary judgment (Doc. 29).

Plaintiffs submitted a response in opposition (Doc. 36), and Defendants presented their

reply (Doc. 38).

## III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine

disputes over facts which, under the substantive law governing the issue, might affect the

outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be

construed in a light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere

allegations or denials of his pleading, but . . .  must set forth specific facts showing that

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505 (1986).

## IV.   ANALYSIS

Defendants seek summary judgment on the grounds that:  (1) the doctrine of

qualified immunity protects the individual defendants from liability for Plaintiffs' claims

brought under 42 U.S.C. § 1983; (2) Plaintiffs have failed to satisfy the elements of

municipal liability under § 1983; (3) the individual defendants are entitled to statutory

immunity for state tort claims; (4) the City of Cincinnati is entitled to statutory immunity

for vicarious liability on the state tort claims; and (5) Plaintiffs have failed to state a cause

of action for Christopher A. Bauer, the father.

### A.   Christopher J. Bauer's § 1983 Claims Against the Individual Defendants

42 U.S.C. § 1983 permits any individual who is deprived of a federally protected

right by a state official to bring a civil claim for money damages.  A claim brought under

§1983 requires proof that: (1) the defendant was a person acting under the color of state

law and (2) the defendant deprived the plaintiff of rights, privileges, or immunities

secured by the Constitution or laws of the United States. *Fridley v. Horrighs*, 291 F.3d

867, 871-72 (6th Cir. 2002).  Plaintiff Christopher J. Bauer brings a claim under §1983

alleging that Defendants' actions constituted an unreasonable seizure and excessive use of

force, in violation of the Fourth Amendment.  Defendants seek summary judgment on the

§ 1983 claims under the grounds of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.*

*Callahan*, 129 S.Ct. 808, 815 (2009).  The Supreme Court has created a two-tiered test to

determine whether or not defendants are entitled to qualified immunity. *Saucier v. Katz*,

533 U.S. 194 (2001).  The first question a court must answer is whether the facts alleged

show the defendants' conduct violated any of plaintiff's constitutional rights.  If that

-8-

question is answered affirmatively, the court must then ask whether the right alleged was clearly established when the violation was alleged to have occurred. *Id.* at 201. While the sequence for answering those questions was recently relaxed by the Supreme Court, the essential questions related to qualified immunity remain unchanged. *Pearson*, 129 S.Ct. 808. Here, Bauer alleges both that the officers unlawfully seized him in violation of the Fourth Amendment, and that they used excessive force in doing so. The Court analyzes each claim in turn.

1. **Bauer's Claim of Unlawful Detention**

a. **Violation of a Constitutional Right**

Bauer alleges that Defendants deprived him of his liberty without due process, in violation of the Fourth Amendment. (Doc. 1 at ¶ 31). To prevail on a claim for wrongful arrest, a plaintiff must show that he was unlawfully detained because the officer lacked probable cause. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). Any arrest, whether formal or *de facto*, requires probable cause. *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 592 (6th Cir. 1994). "An officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). A civil plaintiff has the burden of proving the absence of probable cause. *St. John v. Hickey*, 411 F.3d 762, 769 (6th Cir. 2005). Thus, in a §1983 wrongful arrest claim, the claimant must prove that the arresting officer lacked probable cause to believe that the suspect had committed the charged crime. *Painter v. Bill Robertson*, 185 F.3d 557, 569 (6th Cir. 1999). According

-9-

to the Sixth Circuit Court in *Painter*, probable cause denotes:

> "'Facts and circumstances within the officer's knowledge that
> are sufficient to warrant a prudent person, or one of reasonable
> caution, in believing, in the circumstances shown, that the suspect
> has committed, is committing, or is about to commit an offense.'
> *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (quoting
> *Michigan v. DeFillippo*, 443 U.S. 31, 37, 61 L. Ed. 2d 343, 99 S Ct.
> 2627 (1979)). 'If the circumstances, viewed objectively, support a
> finding of probable cause, the arresting officer's actual motives are
> irrelevant.' *Criss,* 867 F.2d at 262. In section 1983 cases, the
> existence of probable cause usually poses a jury question. *Pyles
> v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Yancey v. Carroll
> County*, 876 F.2d 1238, 1243 (6th Cir. 1989). Whereas the
> implicated circumstances comprise factual issues, the ultimate
> probable cause determination is a mixed issue of law and fact.
> *Ornelas v. United States*, 517 U.S. 690, 696-98, 134 L. Ed. 2d 911,
> 116 S. Ct. 1657 (1996)."

Defendants sought to arrest Bauer for obstructing official business, in violation of

Ohio Rev. Code. Ann. § 2921.31. (Doc. 29 at 6). Ohio Revised Code § 2921.31

provides:

> "(A) No person, without privilege to do so and with purpose to
> prevent, obstruct, or delay the performance by a public official of
> any authorized act, within the public official's official capacity,
> shall do any act that hampers or impedes a public official in the
> performance of the public official's lawful duties."

Defendants argue that Bauer refused to submit to their requests to stop and speak

with them about the suspected robbery at Jersey Mike's, thereby hindering their

investigation and obstructing official business. (Doc. 29 at 10). According to

Defendants, Bauer made eye contact with Officer Mitchell, quickened his pace slightly,

was illuminated by headlights, had Officer McMenama in his field of vision, and had

Officers Mitchell and McMenama yelling in raised voices to stop. (*Id*. at 9-10). These

-10-

are disputed facts, as Bauer contends that he was unaware of the officers' presence, did not quicken his pace, and never made eye contact with Officer Mitchell. (Doc. 36 at 8, 10).

A violation of the obstruction of official business statute requires an affirmative act by the defendant, and the mere failure of a person to respond to an officer's request is not in violation of the statute. *Hamilton v. Hamm*, 514 N.E.2d 942 (Ohio Ct. App. 1986). *See also Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) (a conviction under Ohio Rev. Code § 2921.31 demands an affirmative act that interrupts police business). However, intentionally fleeing from officers who are lawfully attempting to conduct a *Terry* stop is a sufficiently affirmative act to constitute a violation of the statute. *State v. Kates*, 865 N.E.2d 66, 74 (Ohio Ct. App. 2006). *See also State v. Davis*, 749 N.E.2d 322, 323 (Ohio Ct. App. 2000) (holding that evidence that the defendant was aware of the officers efforts to detain him and continued to walk away was sufficient to establish probable cause that he was violating the statute).

Here, there is a genuine issue of material fact in dispute regarding whether or not Bauer was aware of the officers' attempts to conduct an investigatory stop and intentionally ignored them. And "[a]s long as reasonable jurors can disagree about material facts and circumstances facing the officer, probable cause is a question of fact for the jury." *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005). Only when no material issues of fact exist are probable cause determinations rendered legal determinations. *Id.*

*See also Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) ("Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry."). Therefore, whether Defendants had probable cause to arrest Bauer for obstruction of official business cannot be decided on summary judgment, given the presence of disputed issues of material facts.[5]

### b.    Clearly Established Constitutional right

While Plaintiff may be able to establish that the officers violated his right to be free from unlawful arrest, he must also demonstrate that the right was clearly established in order to overcome Defendants' claim of qualified immunity. *Saucier*, 533 U.S. at 201. If the officers' acts were done without probable cause, they violated clearly established law. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). An abundance of prior case law affirms that a citizen has a right to be free from arrest without probable cause. *See, e.g., Carter v. Colerain Twp.*, No. 1:05-cv-163, 2007 U.S. Dist. LEXIS 19561 at ¶¶ 39-40 (S.D. Ohio 2007).

Because there is a genuine issue of material fact as to whether the officers violated Bauer's clearly established rights, the Court cannot determine that the officers are entitled to qualified immunity at this time. *See Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989) (holding that while the existence of qualified immunity is typically a question of law, the task simply cannot be done so long as the facts are in dispute.). Accordingly,

---

[5] Even if the facts at trial are determined to be as Defendants allege (*i.e.*, that Plaintiff was aware of their presence), the Court currently questions whether the Defendants will survive a motion for judgment under Fed. R. Civ. P. 50 as to probable cause to arrest for obstruction of official business.

Defendants' motion for summary judgment on Plaintiff's claim of false arrest on the basis of qualified immunity is denied.

### 2.  Bauer's Claim of Excessive Force

Bauer also alleges that the officers used excessive force in detaining him, in violation of his Fourth Amendment rights.  (Doc. 1 at ¶¶ 31, 35).

### a. Excessive Force Claims Against Officer Mitchell

### (1) Violation of a Constitutional Right

"The Fourth Amendment prohibits the use of excessive force by arresting and investigating officers." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).  In determining whether excessive force has been used, courts use an "objective reasonableness" test which looks to the totality of the circumstances. *Kijowski v. City of Niles*, 372 Fed.Appx. 595, 598 (6th Cir. 2010).  The inquiry is fact specific, and courts look to (1) the severity of the crime at issue; (2) the immediate threat the suspect poses to the safety of the officers and others; (3) the suspect's resistance, if any; and (4) the possibility of flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The reasonableness inquiry is an objective one, evaluated from a reasonable officer's perspective on the scene, and not with the 20/20 vision of hindsight. *Id.*

### (a) Severity of the Crime at Issue

In analyzing the reasonableness of the force used to effect a particular seizure, the courts first look to the severity of the crime at issue. *Graham*, 490 U.S. at 396.  Officers

Mitchell and McMenama sought to arrest Bauer for obstruction of official business, a misdemeanor. The Supreme Court has consistently held that where the underlying crime is only a nonviolent misdemeanor, a lesser degree of force is authorized. *Tennessee v. Garner*, 417 U.S. 1, 12 (1985). Tasers "constitute an intermediate, significant level of force that must be justified by strong government interest [that] *compels* the employment of such force." *Bryan v. McPherson*, 608 F.3d 6614, 622 (9th Cir. 2010).

Defendants argue that they were investigating an armed robbery, a felony offense justifying a greater use of force. (Doc. 29 at 13). Defendants, however, have offered no authority to support their proposition that the relevant crime is not the crime of arrest (*i.e.*, obstructing official business), but rather the crime underlying the reported alarm (*i.e.*, armed robbery). Further, even if the Court accepts Defendants' argument and weighs this factor in Defendants' favor, the severity of the alleged crime underlying the alarm alone is not enough to establish the reasonableness of Defendant Mitchell's use of the taser.

### (b) Immediate threat the suspect poses to the safety of others

In determining whether the use of force is reasonable, Courts will also look to whether the suspect poses an immediate threat to the safety of the officers or others. *Graham*, 490 U.S. at 396. Defendants argue that because commercial armed robberies usually involve firearms, and because the officers believed Bauer to be carrying something, they had reason to believe that Bauer was armed and posed an immediate danger to others. (Doc. 29 at 14). But other than Bauer's proximity to the store, the officers had no reason to believe that he was armed. The officers did not see Bauer

-14-

brandish a weapon, did not confirm that a robbery had occurred, and did not possess a suspect description. Officer Mitchell drew the conclusion that Bauer was armed simply because he had his hands in his coat pockets on a cold winter night. (*See* Doc. 22 at 105, 219).

Defendants also argue that Officer Mitchell cycled the taser a second time out of concern that Bauer was reaching for a weapon. (Doc. 29 at 15). Defendants allege that after Bauer had fallen to the ground due to the first taser cycle, he refused to show his hands and appeared to be moving his hands underneath him. (Doc. 22 at 167). But Officer Mitchell also conceded that Bauer may have been attempting to comply with the officers' orders to show his hands. (*Id.* at 156-158). Officer Mitchell also admitted that after the tasing Bauer was disoriented and not speaking. (*Id.* at 166).[6] Given the above facts, the Court finds that this factor weighs against a finding that the use of the taser was reasonable.

### (c) Suspect's resistance

*Graham* also directs the Court to consider the suspect's resistance in determining whether the use of force was reasonable. *Graham*, 490 U.S. at 396. It is a contested issue of fact whether Bauer made efforts to resist seizure by the police officers. The Sixth Circuit has held that "absent some compelling justification, such as the potential escape of

---

[6] Plaintiffs also assert that the officers never mentioned during eight interviews at the time of the event the alleged perception that Bauer was reaching for a gun; instead, this allegation was first asserted well after the fact, after Mitchell had conferred with his supervisors. (Doc. 36 at 12-13.)

-15-

a dangerous criminal or the threat of immediate harm," the use of a taser on a non-resistant person is unreasonable. *Kijowski*, 372 Fed.Appx. at 600. Here, Defendants have presented no such compelling justification. Bauer was walking, and was struck from behind with the taser. Further, Bauer was lying on the ground, in a disoriented state, when Officer Mitchell cycled the taser a second time. (Doc. 22 at 166). Additionally, the parties concede that the second tasing occurred less than three seconds after the first. (Doc. 36 at 29, ¶ 16).

In *Kijowski*, the Sixth Circuit found that when a second tasing follows "on the heels of the first" the "only tenable conclusion is that it would have been impossible for [the defendant] to muster any fight." *Kijowski*, 372 Fed.Appx. at 600. As in *Kijowski*, the second tasing in this case was on the heels of the first, making it impossible for Bauer to muster any resistance. Accordingly, this factor weighs in favor of Plaintiffs.

### (d) Possibility of flight

Finally, the Court must evaluate whether the possibility of flight weighed in favor of the use of force. *Graham*, 490 U.S. at 396. Defendants concede that "this is not a typical case in which a suspect evaded arrest by sprinting away from officers." (Doc. 29 at 14). Defendants assert instead that Bauer's movements demonstrated that he was "getting ready to run away." (*Id.*) However, Defendants concede that Bauer continued "to walk in the same manner and pace" after they began making efforts to obtain his attention. (Doc. 29 at 28, ¶ 26). Further, even if Bauer's movements demonstrated an

-16-

intent to flee prior to the first tasing, there is no evidence that Bauer made any attempts to flee prior to the second tasing. Accordingly, this factor weighs in favor of Plaintiffs.

Upon the undisputed facts, and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Officer Mitchell's tasing of Bauer was not objectively reasonable as a matter of law, and especially so as to the second tasing.

### (2) Clearly Established Constitutional Right

Even if Officer Mitchell's actions were objectively unreasonable, he is still entitled to qualified immunity unless it is shown that the right he violated was clearly established. *Saucier* 533 U.S. at 201. It need not be shown that the very action in question had previously been unlawful; rather, the unlawfulness may be apparent from "direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Kijowski*, 372 Fed.Appx. at 601.

Based on earlier court rulings, and the Cincinnati Police Department's taser policies, Officer Mitchell had ample notice that his actions were unreasonable. The Sixth Circuit has held that an officer cannot "reasonably have believed that use of a Taser on a non-resistant subject was lawful." *Kijowski*, 372 Fed.Appx. at 601. Courts in other jurisdictions have similarly denied qualified immunity to officers who deployed tasers on non-violent suspects. *See, e.g., Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007) (denying qualified immunity to officer who tased non-violent misdemeanant without warning; incident occurred in 2003); *Orsak v. Metro. Airports Com'n Airport*

-17-

*Police Dept.*, 675 F. Supp.2d 944 (D. Minn. 2009) (no qualified immunity for officers

who tased individual who refused to comply with orders and began riding away on

bicycle; incident occurred in 2006); *Cavanaugh v. Woods Cross City*, No. 1:08-cv-32,

2009 U.S. Dist. LEXIS 116214 (D. Utah Dec. 14, 2009) (no qualified immunity for

officers who used taser on potentially suicidal woman involved in domestic dispute where

she walked "quickly" away from officers and toward home; use of taser without warning

against misdemeanant violated clearly established law; incident occurred in 2006).[7]

Further, the Cincinnati Police Department found that Mitchell's "taser deployment

was not in conformance with Department Standards." (Doc. 36 at 30).

Accordingly, the Court finds that it was clearly established on January 22, 2008

that the use of a taser against a non-violent, non-resisting person of interest was

prohibited by the Constitution. Taken in the light most favorable to Plaintiffs, this Court

finds that the facts demonstrate that Officer Mitchell used unreasonable force on Bauer in

violation of a clearly established constitutional right. Therefore, Defendants' motion for

summary judgment on the excessive force claim against Officer Mitchell is denied.

### b. Bauer's Claims of Excessive Force Against Officer McMenama

In excessive force actions, "each defendant's liability must be assessed

individually, based on his or her own actions." *Dorsey v. Barber*, 517 F.3d 389, 399 n.4

(6th Cir. 2008). Defendants move for summary judgement on the excessive force claim

---

[7] *See also Cockrell v. City of Cincinnati*, No. 1:10-cv-270, 2010 WL 4918725 (S.D. Ohio Nov. 24, 2010), on appeal to the United States Court of Appeals for the Sixth Circuit.

against Officer McMenama on the grounds that Officer McMenama did not tase or use

any other force against Bauer. (Doc. 29 at 15). In response, Plaintiffs set forth no

specific facts alleging that Officer McMenama engaged in any excessive force, and

merely alleges that "both Defendants Mitchell and McMenama used excessive

unnecessary force that placed Mr. Bauer in jeopardy of his own life." (Doc. 36 at 16).

At oral argument, Plaintiffs suggested for the first time that Officer McMenama is

liable for excessive force because he failed to prevent Officer Mitchell from deploying his

taser. While the Sixth Circuit has held that a police officer who fails to act to prevent the

use of excessive force may face §1983 liability, that liability only attaches only "where

(1) the officer observed or had reason to know that excessive force would be or was being

used, and (2) the officer had both the opportunity and the means to prevent the harm from

occurring." *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008). Plaintiffs have

not pled any specific facts to show that Officer McMenama was aware that Officer

Mitchell was going to use excessive force or that Officer McMenama had the means to

prevent such use of force.

Because Plaintiffs fail to set forth specific facts showing there is a genuine issue

for trial, Defendants are entitled to summary judgment on the charge of excessive force

against Officer McMenama.

### c. Bauer's Claims of Excessive Force Against Chief Streicher

Defendants also move for summary judgment on any excessive force claims

-19-

directed at Chief Streicher, on the grounds that the record shows Chief Streicher was not present the night of the incident. (Doc. 29 at 16). Plaintiffs failed to respond to this argument, and have set forth no specific facts showing there is a genuine issue for trial. Accordingly, Defendants' motion for summary judgment on any excessive force claims directed against Chief Streicher is granted.

### B.    Plaintiffs' Claims of Municipal Liability under 42 U.S.C. §1983

A municipal body may be liable under §1983 for the unconstitutional acts of its officials where an official policy was the moving force behind the violation. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978). In some circumstances, a local government's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983. *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). To impose liability on a failure to train theory, the plaintiff must show that: (1) the defendant failed to adequately train its officials; (2) that the failure constituted deliberate indifference to the rights of those likely to come into contact with the officials; and (3) that such indifference was closely related to the ultimate injury. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

Plaintiffs argue that the City failed to properly train its officers in "appropriate usage of the tools available in a police cruiser regarding outward notifications." (Doc. 36 at 18). Plaintiffs further allege that Officers Mitchell and McMenama never received

basic first responder training. (*Id*. at 19). Plaintiffs contend that had the officers received proper first responder training, they would have first verified the alarm and avoided the resulting altercation. (Doc. 36 at 19).

Defendants respond that Plaintiffs have failed to offer any evidence that the City of Cincinnati acted with deliberate indifference. (Doc. 29 at 20). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 131 S.Ct. at 1360. A pattern of similar constitutional violations by untrained employees is "ordinarily necessary to demonstrate deliberate indifference on a failure to train theory of liability." *Id*. Further, without notice that a course of training is deficient in a particular respect, municipal decision makers "can hardly be said to have deliberately chosen a training program that will cause violations of Constitutional rights." *Id*.

Plaintiffs simply failed to respond to this argument in their memorandum in opposition. Further, Plaintiffs have set forth no facts showing that the City of Cincinnati was aware of a deficiency in first responder training and cannot point to a pattern of similar Constitutional violations. As a result, the City of Cincinnati cannot be said to have deliberately chosen a training method that will cause constitutional violations. Defendants' motion for summary judgment on Plaintiffs' claims of municipal liability under § 1983 is therefore granted.

### C.    Christopher J. Bauer's State Tort Claims

Plaintiff Christopher J. Bauer has brought claims under Ohio tort law against

Defendants Mitchell, McMenama, and Streicher for (1) negligence; (2) assault and battery; and (3) false imprisonment and false arrest. Plaintiff also alleges that the City of Cincinnati is vicariously liable for the torts of its employees. Defendants seek summary judgement on all of Christopher J. Bauer's state tort law claims on the grounds of statutory immunity.

### 1.   Tort Claims Against Officers Mitchell and McMenama

Ohio law provides immunity to political subdivisions and their employees for tort actions unless the employee's acts were outside the scope of the employment responsibilities or the employee acted with malicious purpose, bad faith, or in a wanton or reckless manner. Ohio Rev. Code Ann. § 2744.03(A)(6) (2011).[8] Malicious purpose refers to "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 737 N.E.2d 563, 567 (Ohio 2000). Bad faith implies actual or constructive fraud, and is prompted by some "interested or sinister motive" rather than "an honest mistake as to one's rights or duties." *Id*. Finally, reckless conduct is "an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent." *Id*. The Supreme Court of Ohio has further defined reckless conduct to be that done "in perverse disregard of a known risk." *Id*.

---

[8] The parties concede that Officers Mitchell and McMenama were acting within the scope of their employment. (Doc. 36 at 15).

Defendants assert that Officers Mitchell and McMenama are immune from any tort liability arising from the incident because there is no evidence they acted with bad faith, malicious purpose, or reckless and wanton conduct. (Doc. 29 at 17-18).

As discussed *supra*, the officers' actions were objectively unreasonable. In this context, and taking the evidence in the light most favorable to Plaintiffs, the Court finds that genuine issues of material facts exist as to whether or not Officers Mitchell and McMenama acted recklessly, with reason to know they would cause unnecessary harm to Bauer, when they failed to verify the alarm, failed to verify the offense, failed to obtain a suspect description, failed to warn Bauer, and simply proceeded to tase him. Therefore, Defendants' motion for summary judgment on state tort claims against Officers Mitchell and McMenama is denied.

### 2. Tort Claims against Chief Streicher in his individual capacity

Defendants seek summary judgment on all state tort law claims against Chief Streicher on the grounds that Defendants have failed to prove that he acted with malicious purpose, bad faith, or reckless and wanton manner. (Doc. 29 at 23). Plaintiffs have failed to respond to this argument and have set forth no specific facts showing there is a genuine issue for trial. Accordingly, summary judgment is granted in favor of Defendants on all state tort claims directed against Chief Streicher in his individual capacity.

### 3. Tort Claims against the City of Cincinnati and Chief Streicher in his official capacity

Defendants also assert that the City of Cincinnati and Chief Streicher are immune from state tort liability because their actions occurred while providing police services.

-23-

(Doc. 29 at 22). As a preliminary matter, a suit against a municipal official acting in his official capacity is akin to a suit against the municipality itself. *See Printz v. United States*, 521 U.S. 898, 930-931 (1997). State tort claims against Chief Streicher in his official capacity are therefore redundant with state tort claims against the City of Cincinnati, and, accordingly, are hereby dismissed. *See* Fed. R. Civ. P. 12(f) (authorizing the Court to dismiss redundant claims). Further, because the Court has granted summary judgment in favor of Defendants on all counts against Chief Streicher, he is dismissed as a party to this action.

Ohio law provides municipalities for immunity for acts done while performing a government function, including police services. Ohio Rev. Code Ann. § § 2744.01-02. Ohio courts have generally held that the statute generally immunizes municipalities from intentional tort claims. *See Thornton v. City of Cleveland*, 890 N.E.2d 353, 355 (Ohio Ct. App. 2008). As a result, the City of Cincinnati is entitled to statutory immunity for Bauer's intentional tort claims, namely assault and battery (Count III) and false arrest (Count VI).

The statute does impose liability on municipalities for injury, death, or loss to a person or property caused by the negligent performance of acts by municipal employees with respect to proprietary functions of the political subdivisions. *Id*. at § 2744.02(B)(2). However, the statute specifically excludes police services from the definition of proprietary functions. *Id*. at § 2744.01(G).

-24-

Accordingly, the Court finds that City of Cincinnati has statutory immunity from any vicarious liability tort claims.

### D.    Christopher A. Bauer's Tort Claims

Defendants also seek summary judgment on Plaintiff Christopher A. Bauer's tort claim (Count V). (Doc. 18). Plaintiffs allege that Bauer was "caused to observe the wrongful assault of his son by the Defendants and as a result suffered a loss of society, and companionship of his son." (Doc. 1 at ¶ 49). While the complaint does not specify whether Plaintiffs make this assertion as a claim for intentional infliction of emotional distress, a claim for negligent infliction of emotional distress, or a claim for loss of consortium, Plaintiffs cannot satisfy the elements of any of these causes of action. (*See id.* at ¶¶ 49-52).

To pursue a claim for intentional infliction of emotional distress, Plaintiff must show that: (1) Defendants intended to cause Bauer's emotional distress or knew or should have known that their actions would result in emotional distress; (2) the conduct was extreme and outrageous; (3) Defendants' actions were the proximate cause of Bauer's distress; and (4) that Bauer's emotional distress was severe. *Pyle v. Pyle*, 463 N.E.2d 98, 100 (Ohio 1983). Plaintiffs have pled no facts indicating that Defendants intentionally or recklessly caused distress to Christopher A. Bauer.

Ohio recognizes only a limited claim for negligent infliction of emotional distress, available only in cases where the plaintiff was a bystander to an accident or was in fear of

-25-

physical consequences to his own person. *High v. Howard*, 592 N.E.2d 818, 820-821

(Ohio 1992). Here, Christopher A. Bauer did not arrive until after his son had been tased

and the father was not in fear of physical consequences to his own person. (Doc. 36 at

32, ¶ 11). Christopher A. Bauer has therefore failed to state a claim for negligent

infliction of emotional distress under Ohio law.

Finally, Ohio does not recognized the right of a parent to recover damages for the

loss of consortium of an adult child. *Cole v. Broomsticks, Inc.*, 669 N.E.2d 253 at 256

(Ohio Ct. App. 1995).

Because Plaintiffs have shown no facts that support their claim on behalf of

Christopher A. Bauer, Defendant's motion for summary judgment on Count V is granted.

## V.     CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Doc. 29)

is **GRANTED IN PART AND DENIED IN PART**.  Specifically:

1.      Defendants' motion for summary judgment on Christopher J. Bauer's § 1983
        claim for unlawful arrest (Count I) against Defendants Mitchell and McMenama
        is **DENIED**;

2.      Defendants' motion for summary judgment on Christopher J. Bauer's § 1983
        claim for excessive force (Count I) is **DENIED** as against Defendant Mitchell,
        and it is **GRANTED** as against Defendants McMenama and Streicher;

3.      Defendants' motion for summary judgment on Christopher J. Bauer's § 1983
        claim for municipal liability (Count I) is **GRANTED**;

4.      Defendants' motion for summary judgment on Christopher J. Bauer's tort claims
        (Counts II, III, and VI) is **DENIED** as to Defendants Mitchell and McMenama,
        and it is **GRANTED** as to Defendant Streicher acting in his individual capacity;

5.     Defendants' motion for summary judgment on Christopher J. Bauer's claim of
       vicarious liability against Defendant City of Cincinnati is **GRANTED**;

6.     Defendants' motion for summary judgment on Plaintiff Christopher A. Bauer's
       tort claims (Count V) is **GRANTED.**

       **IT IS SO ORDERED**.

Date: _10/24/11_

                                          *Timothy S. Black*
                                          Timothy S. Black
                                          United States District Judge